# Exhibit

# 5

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 97-CR-19288 |
| LEONARD LOGAN, | ) | |
| Defendant. | ) | |

REPORT OF PROCEEDINGS had at the hearing in the above-entitled cause before the HONORABLE JAMES M. OBBISH, Judge of said court, on the 1st day of September, 2009.

PRESENT:
HONORABLE ANITA ALVAREZ,
State's Attorney of Cook County, by:
MS. Carol Rogala and Ms. Virginia Bigane,
Assistant State's Attorneys,
appeared on behalf of the People;

MS. Tara Thompson and Ms. Gayle Horn,
appeared on behalf of the Petitioner.

Patrick J. Flannery
Official Court Reporter
License No. 084-001220


Case 2:26-mc-00012-BHL Filed 03/11/26 Page 2 of 28 Document 1-5
Logan, Leonard v. City of Chicago, et al. - 24 C 3897, CCSAO_004202

THE COURT: You may step down.

(Witness excused.)

THE COURT: Call your next.

MS. THOMPSON: We call Princess Thomas.

THE COURT: You can step all the way up here. Watch your step as you go into the witness box. Remain standing. Raise your right hand.

(Witness sworn.)

PRINCESS THOMAS,

called as a witness on behalf of the defense, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. THOMPSON:

THE CLERK: Please be seated.

THE COURT: Miss Thompson.

MS. THOMPSON:

Q. Miss Thomas, please state your name and spell your name for the record?

THE WITNESS: Princess Yolanda Thomas, P-r-i-n-c-e-s-s, Y-o-l-a-n-d-a, T-h-o-m-a-s.

Q. Miss Thomas, where do you live?



Case 2:26-mc-00012-BHL Filed 03/11/26 Page 3 of 28 Document 1-5
Logan, Leonard v. City of Chicago, et al. - 24 C 3897, CCSAO_004266

A. Milwaukee, Wisconsin.
Q. How long have you lived in Milwaukee?
A. 25 years.
Q. Are you currently employed?
A. Yes, I am.
Q. Where are you employed?
A. Pick and Save.
Q. How long have you been employed at the Pick and Save?
A. 12 years.
Q. Miss Thomas, you know Chevelle Thomas?
A. Yes, I do.
Q. What is your relationship to her?
A. She is my sister.
Q. Have you and Chevelle Thomas ever lived together?
A. Yes, we have.
Q. How much of your life have you and Chevelle lived together?
A. All of our live's up until 2006. Yeah, 2006.
Q. Miss Thomas, have you been convicted of a felony in the last ten years?
A. No.

Q. I want to ask you a few questions about your relationship with Leonard Logan. Do you know Leonard Logan?
A. Yes, I do.
Q. How do you know him?
A. Ever him since he was, maybe, about four.
Q. What is your relationship to Mr. Logan?
A. Well, like a step aunty.
Q. You know other member of Mr. Logan's family?
A. Yes, I do.
Q. What is your relationship like with the other people, Mrs. Thomas?
MS. ROGALA: Objection. Relevance.
THE COURT: Could go to motive or bias. Usually that would be something for cross-examination. How would it be relevant here?
MS. THOMPSON: Just setting background about her relationship with Mr. Logan, extent of that relationship exist, anticipating there is going to be some bias issue, but I can save that.
THE COURT: See if you need to go back into reopen direct.
MS. THOMPSON: Okay.

I want to ask you some questions about March of 1997. Does the date March 15th have any significance to your family?

THE WITNESS: Yes, it does?

Q. What significance does that date have?

A. My mother's birthday.

Q. Does your family observe your mother's birthday?

A. Yes.

Q. How do you observe it?

A. We celebrate. We cook big dinners, go out. A lot of times we go to one of her favorite bars that she used to sing, and stuff like that, and hang out. It is like a bar and grill. We go there eat, listen to live music.

Q. Did your family observe your mother's birthday in 1997?

A. Yes, we did.

Q. Do you remember when you observed your mother's birthday in 1997?

A. When, I don't know what you mean by when.

Q. You testified your family went out to the restaurant?

A. Yes.


Case 2:26-mc-00012-BHL Filed 03/11/26 Page 6 of 28 Document 1-5

[redacted]

Q. Did you go out to the restaurant in May of 1997?
A. Yes.
Q. You remember when you went to the restaurant?
A. I don't remember exact date, but I know it wasn't on my mother's birthday. Maybe about day or two, two days just couple days after. Because we didn't go directly on her birthday that year.
Q. Did you ever celebrate your mother's birthday before March 15th?
A. No, we didn't.
Q. 1997?
A. No, it was after.
Q. Who from your family attended the observance that year?
A. Chevelle and I, Leonard Logan, couple of my friends, Rosemary. I can't really remember everybody that attended, but.
Q. You testified Mr. Logan attended?
A. Yeah, he did.
Q. How do you know Mr. Mr. Logan came to Milwaukee to attend that observance that year?
A. During that time he was there a lot. So,

he was there a lot. To my understanding he was there the whole, just the whole time, you know the whole week. Because usually when he came up, he would stay for days.

Q. You know where did he stay when he can to Milwaukee?

A. He would stay with us.

Q. And the time that you saw him in Milwaukee for your mother's birthday did he stay with you at that time?

A. Yes, he did.

Q. You remember specifically what day Mr. Logan came to Milwaukee that year?

A. I don't know. It could have been Friday, Saturday. I am just not clear on the complete days, but I know he was there around my mother's birthday.

Q. Do you remember what day this fell on that year?

A. Well, going back I just recently found out it was on a Saturday.

Q. When you say he could have come Friday or Saturday you are saying the 14th or 15th?

A. It could have been 15th. It could have been Saturday. It could have been Sunday. I am just

not clear of, I just can't remember exact dates.

Q. You say you remember him staying few days?

A. Uh-huh.

Q. How confident are you that he stayed?

A. Excuse me?

Q. How confident are you he stayed a few days?

A. Very confident. When he would come, he would stay for days.

Q. And you are aware that Mr. Logan was charged with a murder that supposedly occurred March of 1997, right?

A. Yeah, I am.

Q. Did you, how did you hear about his trial for that murder?

A. Well, after, I guess after he was wanted and they came looking for him, stuff like that. That is when I became aware of the whole trial regarding it, regarding that.

Not to mention that his attorney or lawyers or whoever was working for him then got in touch with us regarding the case.

Q. Did you talk with the attorneys about the case?

A. I did.

Q. When did you talk with his attorneys about the case?

A. During the time that he was preparing for trial and stuff like that.

Q. Did you go to Court for his trial?

A. Yes, I did.

Q. How did you get there?

A. An investigator from here came to Wisconsin, picked me up brought me here.

Q. Did you testify at Mr. Logan's trial?

A. No, I didn't.

Q. Why didn't you testify?

A. I have no idea.

Q. If you had been called to testify, would you have testified about Leonard Logan being in Milwaukee in March 1997?

MS. ROGALA: Objection. Calls for speculation.

THE COURT: Sustained as to what she would you have testified.

MS. THOMPSON:

Q. If you had been called to testify and you had been asked -- well, strike that.

Your Honor, point of clarification.

I did need to mark exhibits for showing, to show the witness something.

THE COURT: I think you should.

MS. THOMPSON: They are going to be part of the record. I am going to show Miss Thomas what I have marked as Plaintiff's Exhibit 1.

Miss Thomas, I am showing you what I have marked as Plaintiff's Exhibit No. 1.

Your Honor, do you want a copy of this?

THE COURT: No.

MS. THOMPSON:

Q. You recognize the document I have handed to you, Miss Thomas?

THE WITNESS: Yes, I do.

Q. What is it?

A. An affidavit.

Q. Looking at the second page of the document, does your signature appear on this document?

A. Yes.

Q. Do you remember signing this document?

A. Yes, I do.

Q. How did you come to sign this document?

A. If I am not mistaken, this information was

mailed to me. I read it. I signed my name. I mailed it back.

Q. And is the information contained in this affidavit true and accurate?

A. Yes, it is.

Q. Do you know someone named Latanya Payton?

A. No, I don't.

Q. Have you ever heard of Latanya Payton in reference to Leonard Logan?

A. No, I haven't.

Q. Do you know anything about the relationship between Latanya Payton and Leonard Logan?

A. No, I didn't.

Q. Did you ever tell Mr. Logan's attorneys anything about a relationship between Latanya Payton and Leonard Logan?

A. No, I didn't.

Q. Have you spoken with anyone from the State in connection with Leonard Logan's case?

A. Just recently when they came to my job.

Q. You spoke with them at your job?

A. Yeah, week ago.

Q. You spoke with them willingly?

A. Yes.

Q. How long did you speak with them for?
A. Maybe about anywhere from 25 minutes to half hour.
MS. THOMPSON: If I could have a moment, your Honor?
THE COURT: Yes.
MS. THOMPSON: Nothing further, your Honor.
THE COURT: Any cross?

CROSS-EXAMINATION
BY; MS. ROGALA:

Q. When did you first learn that Mr. Logan had been arrested on this case?
A. Had to be, I don't know, maybe, June or July. I am not quite sure, but I think it was '97, '97, maybe August or September. Somewhere maybe August or September when he got arrested. I don't know what day.
Q. But it was in the summer or early fall of 1997?
A. I think it was like the ending of the summer like, maybe, early fall.
Q. How did you learn that he was arrested?
A. Well, the United States Marshals had come

looking for him.

THE COURT: The question was how did you learn he had been arrested. The marshals came, he had not yet been arrested.

THE WITNESS: Maybe through one of his family members.

MS. ROGALA:

Q. After you learned that Mr. Logan had been arrested did you learn what he was charged with?

A. Yeah, I did.

Q. When did you learn what he was charged with?

A. Around the same time that I learned that he was arrested.

Q. Again from his family?

A. Maybe from his family. I am not too clear going 13 years back. I am just not for certain who told me, how I found out all that. I am just not certain of that.

Q. When did you find out that the date of the murder was March 18th of 1997?

A. When I received papers, forms regarding his case.

Q. What papers did you receive?

[redacted]

A. I had a bunch of papers that was coming from whoever was working on his case that wanted, that wanted us to testify.

I was getting a lot of information from whoever was working on his case.

Q. So, is it fair so say the lawyers who were working on his case before the trial contacted you?

A. During the trial or before the trial.

Q. Obviously they contacted you before trial because you came to court expecting to testify?

A. I did. Exactly.

Q. You had talked to his lawyer before you made that trip?

A. Yes.

Q. In fact, the lawyer made arrangements for an investigator to come, bring you to court?

A. Exactly. Exactly.

Q. Okay. But you are uncertain when you learned that March 18th was the date that we were concerned about, right?

A. Right. I never did really know. I never did really know what date, what you know what day it took place, the crime took please.

I never was really clear on what day

it took place.

Q. Do you understand today that that is the date?

A. I do.

Q. Did you talk to Mr. Logan about being an alibi witness for him before his trial?

A. (Nods head yes.)

Q. You need to answer out loud.

A. I am sorry. Yes.

Q. Mr. Logan asked you to come to court to testify on his behalf, correct?

A. He did.

Q. Did you discuss coming to court with your sister Chevelle?

A. I did.

Q. At that time back in 1997?

A. Exactly.

Q. Did you ever go to the police and tell the police that Mr. Logan was with you at the time of the murder?

A. I didn't go to the police tell the police anything. I never did get a chance to talk to anybody.

Q. You never talked to the State's Attorney

office about this case until last week?

A. Exactly. I mean if I did, it was so long ago. I don't know if I talked, you know, I just can't recall 12, 13 years ago everybody I talked to during that time.

Because I just, I thought it was done. So, it just didn't cross my mind to just remember all this.

Q. You said it was possible that Mr. Logan came to Milwaukee a few days before your mother's birthday in 1997?

A. It could have been on her birthday. It could have been the day after.

Q. You said he stayed for several days from the time he arrived?

A. He would always stay for days.

Q. You know what day he left Milwaukee?

A. I don't know what day he left Milwaukee.

Q. Now, the affidavit that Counsel showed you actually bears two signatures from you, correct?

A. Uh-huh.

Q. That is yes?

THE COURT: You have to answer yes or no.

THE WITNESS: I am sorry. Yes.

MS. ROGALA:

Q. Why did you sign it twice?

THE WITNESS: You said why I did? Also you know what, I don't know if someone tried to get in touch with us a while ago, maybe, some years after. I don't know why I signed it twice.

Q. Next to your signature on the line it says 1/1/05, correct?

A. Uh-huh.

Q. January 1st, 2005?

A. Uh-huh.

Q. That is the date you signed it?

A. Yeah.

Q. Now, there is a second date on that affidavit?

A. Uh-huh.

Q. Where it says --

THE COURT: Ma'am.

THE WITNESS: I mean yes.

THE COURT: Just try to say yes or no for the Court Reporter. Thank you.

THE WITNESS: Okay.

MS. ROGALA:

Q. The second date says, subscribed and sworn

to before me on this 2nd day of January, 2006, correct?

THE WITNESS: Yes.

Q. Is that the date you appeared in front of the notary public?

A. Yeah. Because I had to take some papers and have them, I had to take them to the bank and have them notarized.

Q. So, you had the affidavit for a year, is that right?

A. For a year.

Q. From 2005 until 2006?

A. Could be. Yes. I guess.

Q. I'd like to ask you about a handwritten letter you sent to the Court. Do you recall writing a letter that was sent to the court?

A. Yes.

Q. That was back in 2001?

A. Yes.

Q. You signed that letter as well as your sister Chevelle, right?

A. I wrote it for the both of us.

Q. Who asked you to write that letter?

A. Someone that was working on his case.

Q. Was that before or after Mr. Logan was convicted?
A. After.
Q. So, it was the lawyer who was trying to get him a new trial at that point?
A. I assume so.
Q. Did you learn that there were post-trial proceedings in Mr. Logan's case before he was sentenced?
A. No. Not that I know of.
Q. Were you asked to come to court after he was convicted, but before today?
A. After he was convicted I know I was asked to come to court to testify. When he went, when he went to trial for the case, but outside of that, not that I can remember.
Q. You were not asked to come after that?
A. Not that I can remember.
Q. In this letter you indicate that Mr. Logan was in Milwaukee at the time of this "so called crime", correct?
A. Uh-huh.
Q. You don't have any argument that someone was killed in this case, correct?

A. Right. Because then I knew what was going on.
Q. You are just saying Mr. Logan was with you at that time?
A. Right.
Q. How did you get to court today?
A. The Exoneration Project came and picked me up.
Q. The lawyers who currently represent Mr. Logan?
A. Yes. Yes. I am sorry about that.
Q. Did you meet with them before today to discuss your testimony?
A. Yes, I did.
Q. Who did you meet with?
A. Tara and Atalia (phonetic).
Q. Did they take any notes during your interview?
A. They wrote some things down.
Q. Did they ever ask you to sign anything?
A. No. I don't think so.
Q. You told Miss Thompson you spoke to a State's Attorney investigator last week, correct?
A. Correct.

MS. ROGALA: If I could have a moment, please, Judge?

Isn't it true that you told the State's Attorney investigator that you could not be sure that Mr. Logan was present in Milwaukee on March 17th of 1997?

THE WITNESS: No. I told them that I wasn't clear of the exact date. They wanted me to say was I sure of the exact date.

I was like, I can't say if I was, what exact day it was, but I know he was there that week.

Q. But you don't know when he arrived, what day he arrived?

A. No, I don't know exact day he arrived, but I know it was after my mother's birthday.

Q. You don't know exactly what day he left?

A. I don't know if it was Sunday or Monday. Every time he came, he never would leave right away. He would always stay for days.

What I was trying to tell them he could have been there the whole week.

Q. Were you aware that Mr. Logan had a court appearance on March 17th in Chicago?

Evening
3/17/87


Logan, Leonard v. City of Chicago, et al. - 24 C 3897, CCSAO_004289

A. I don't know, you know what he was thinking. Maybe. I don't --

THE COURT: Were you aware of that'.

THE WITNESS: No. I can't. No, I can't keep track of everything, you know. I wasn't keeping track if he had something to do and stuff like that.

MS. ROGALA: May I have one moment, Judge.

Thanks. Judge, nothing further of Miss Thomas.

MS. THOMPSON: Brief follow up, your Honor.

THE COURT: All right.

REDIRECT EXAMINATION

BY; MS. THOMPSON:

Q. Miss Thomas, regardless of the date you had your affidavit notarized, this affidavit is true?

A. Yes.

Q. And do you remember the events, what occurred in March of 1997 better back in 2006 when you signed this affidavit?

A. Yes.

Q. And at the time you signed the affidavit were you confident that Leonard Logan had come to Milwaukee the evening of March 17th, 1997?

A. Yes.

Q. But since that time your memory today is less clear than it was at that time?

A. Most definitely. Yes.

Q. And when I met with you to talk with you about your knowledge about the case, what did I tell you about how you should testify today?

A. To tell you the truth.

Q. When I interviewed you did I tell you what day this crime occurred on?

A. No, you didn't.

MS. THOMPSON: Nothing further.

THE COURT: Anything else?

MS. ROGALA: No. Thank you, Judge.

THE COURT: You may step down, Ma'am. Thank you.

THE WITNESS: Okay.

(Witness excused.)

THE WITNESS: Call your next witness.

MS. THOMPSON: Call Chevelle Thomas.

THE COURT: Please step up where the Deputy is directing you. Watch your step. Remain standing. Raise your right hand to be sworn in by the lady on my left.

THE CLERK: Raise your rate hand.