# Exhibit

# 6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LEONARD LOGAN, Plaintiff, vs. NEDRA CHANDLER, Warden, Defendant. | No. 12 C 6170<br>Chicago, Illinois<br>February 19, 2014<br>1:45 o'clock p.m. |

TRANSCRIPT OF PROCEEDINGS -
Continued Evidentiary Hearing
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff: LOEVY & LOEVY
BY: MS. TARA E. THOMPSON
MR. WILL EVANS, 7-11 student
MR. ERIC ALSTON, 7-11 student
312 North May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

For the Defendant: STATE OF ILLINOIS
OFFICE OF THE ATTORNEY GENERAL
BY: MR. MATTHEW P. BECKER
MR. NEAL B. GOODFRIEND
MR. VINCENZO CHIMERA
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5643

COLLEEN M. CONWAY, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 2144-A
Chicago, Illinois 60604
(312) 435-5594
*colleen_conway@ilnd.uscourts.gov*

There was a witness that we had considered calling today who we knowingly don't intend to call, and my understanding is that the State doesn't intend to call that person either. So I think that person would like to be present in the courtroom.

THE COURT: Okay. Who are we talking about?

MS. THOMPSON: It's Mr. Logan's mother.

THE COURT: What's the first name?

MS. THOMPSON: Ezzie, E-z-z-i-e.

THE COURT: Last name Logan?

MS. THOMPSON: Logan, yeah.

THE COURT: Okay. You don't have any -- you are not planning to call her?

MR. CHIMERA: No.

THE COURT: Okay. So that's fine, then.

MS. THOMPSON: Thank you, Your Honor.

THE COURT: Go ahead.

PRINCESS THOMAS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ALSTON:

**Q.** Could you please state your name for the Court.

**A.** Princess Thomas.

THE COURT: All right. So I'm going to move the microphone. Just stay right where you are. Adjust the microphone. We really just need to get this --

(Pause.)

BY THE WITNESS:

A. Princess Thomas.

BY MR. ALSTON:

Q. Now, Ms. Thomas, how are you related to the petitioner, Leonard Logan?

A. Actually, Leonard Logan is my niece brother, so --

Q. Okay. So you've known him a long time, then?

A. Since he was a baby.

Q. And in the spring of 1997, where were you living?

A. 54th and Center, Milwaukee, Wisconsin.

Q. Did you have a job then?

A. Yes, I did.

Q. Where -- what were you employed in?

A. I worked for a bindery company.

Q. Was this a full-time job?

A. Full time. Plastic coil.

Q. In March of 1997, did you see Leonard Logan in Milwaukee?

A. Yes, I did.

Q. Do you recall when in March he was in Milwaukee?

A. He was in Milwaukee -- he was in -- a lot.

Q. So he was there quite a bit that month?

A. Quite a bit.

Q. Are there any events in particular that month you recall him being at in Milwaukee?

**A.** Well, when -- it's the date it was my mother's birthday. We kind of hung out at the --
**Q.** Could you --
**A.** -- jazz club where she used to go to.
**Q.** Could you tell me a bit more about the birthday celebration? What was the name of the jazz club?
**A.** The jazz club was called Boobie's.
**Q.** Okay. And any other details you recall about it?
**A.** Well, it was -- it's a blues and jazz club where they do live music. And usually on different days, they have drink specials and food specials, so --
**Q.** Did they do live jazz every night there?
**A.** Yeah, they did jazz at least three or four times, I want to say, per week.
**Q.** Okay. I'm fast-forwarding now to -- did you -- do you recall when Leonard left Milwaukee following your mother's birthday celebration?
**A.** No, not really, because he was there for days.
**Q.** Okay.
**A.** For a couple of days.
**Q.** Okay. And, now, regarding Leonard's original trial, his murder trial --
**A.** Uh-huh.
**Q.** -- you went to that trial, correct?
**A.** Yes, I did.

**Q.** How did you get there?

**A.** An investigator from here came to Wisconsin and picked me and my sister up.

**Q.** And who is your sister?

**A.** Chevelle Thomas.

**Q.** Did you discuss anything about your desire to testify with the investigator on the drive down?

**A.** No, I didn't.

**Q.** Okay. And when you arrived at court with the investigator, where were you taken?

**A.** Actually, we were taken off to a room. We did a -- we did a walk through the courthouse, and we were put in this room where they said we was gonna be placed until we were called to testify.

**Q.** Could you describe that room a little more, any details you remember, either about how you got there or about the room itself?

**A.** It was a very tight room. Actually, we walked through an area where there were different booths, and they said that that was people working on different things. And we were taken off into a little, small, closed-in room where we sat the whole day.

**Q.** Would it be accurate to describe those little booths as cubicles?

**A.** Yeah, yeah, yes.

Q. Okay. And in this little room you're in, was there anyone else in that room with you?
A. It was myself, Chevelle, and it was a guy that -- I guess actually he was there, he said he was there when the incident happened, so they had him in the back with us.
Q. When you say "incident," do you mean the shooting for which Leonard was convicted?
A. Right, right.
Q. Okay. And how did you know that he was at the incident for which Leonard was convicted?
A. He told me. He told us.
Q. Okay. And was he in the room all day with you?
A. Yeah. He was in the room most of the day with us.
Q. Okay. You say "most of the day," so --
A. Yeah. I mean, with the whole day. I'm sorry about that. He was there with us the whole day.
Q. Okay. And how about Chevelle? Was he in that room with you all day?
A. Chevelle, she was there, yeah.
Q. Okay. And so you never left the room to testify the trial -- at trial, did you?
A. No.
Q. And you got the impression that Chevelle didn't do so either?
A. No.

Q. And did you ever see the inside of a courtroom the entire time you were in court for Leonard's trial?
A. No, I didn't.
Q. Do you know why you didn't testify at trial?
A. I was told that we -- I wasn't -- we wasn't needed.
Q. Could you describe the conversation, where it took place, and when you were told that you were no longer needed?
A. Well, after the trial was over, he came up and he got us out the room.
THE COURT: Who's "he"? "He"?
THE WITNESS: The private investigator.
THE COURT: The same person that had driven you down?
THE WITNESS: Same person that came up and got us.
BY THE WITNESS:
A. He came back into the room and he told us that we was not needed to testify for Leonard.
BY MR. ALSTON:
Q. So --
A. That it was over.
Q. So Leonard's trial attorneys never told you that you wouldn't testify?
A. Never talked to them.
Q. Okay. And so, to your recollection, from the time you entered the courthouse -- when the investigator dropped you off, you walked to this small room after seeing some cubicles.

**A.** Uh-huh.
**Q.** You didn't talk to Leonard's trial attorneys at any point during that day?
**A.** I never talked to them. I never spoke with them.
**Q.** Okay. And do you know Latonya Payton?
**A.** No.
**Q.** So you couldn't -- you never told either the investigator or Leonard's attorneys that -- about some kind of possible domestic issue between Leonard and Ms. Payton?
**A.** I didn't hear about Latonya Payton until later on when the case was tooken over.
**Q.** Okay. And at trial, did you discuss any aspect of your testimony with Leonard's attorneys?
**A.** No.
**Q.** What about with a clerk working for the attorneys?
**A.** Yeah. Well, in -- we initially started out talking to his attorney and then we started just dealing with the -- I guess the private investigator.
**Q.** Okay.
**A.** We started just talking with him, period. We --
**Q.** When you -- when you say "initially" --
**A.** Uh-huh.
**Q.** -- do you mean prior to trial, you had --
**A.** Right.
**Q.** -- some conversation with his attorneys?

**A.** Right, right.

THE COURT: Okay. I am going to say to you what I have said to pretty much everybody. It is not helpful for you to lead this witness. Okay?

MR. ALSTON: Understood.

THE COURT: I want to hear what she has to say, not what you have to say.

MR. ALSTON: Understood, Your Honor.

BY MR. ALSTON:

**Q.** So at any point prior to or during Leonard's trial did you tell anyone that you did not want to testify?

**A.** Never said that. Never told anyone that. That was the reason why we were there to testify.

MR. ALSTON: Your Honor, one moment, please.

THE COURT: Okay.

(Student-attorney conferring with counsel.)

BY MR. ALSTON:

**Q.** So you just mentioned that you initially spoke with Leonard's attorneys at some point?

**A.** Uh-huh.

**Q.** What do you recall about talking to them with?

**A.** Well, we was told that --

THE COURT: Let's back up a little bit.

THE WITNESS: Okay.

THE COURT: Did you speak with them in person or on

the phone?

THE WITNESS: I spoke with them on the phone.

THE COURT: Okay. And how long before you actually came to Chicago was that, about?

THE WITNESS: Well, from -- I guess from the time that he was arrested to the time that he had his first --

THE COURT: Yeah.

THE WITNESS: -- initial court day.

THE COURT: So it was between the arrest and the first court date?

THE WITNESS: Uh-huh, uh-huh.

THE COURT: Not the trial, but the first -- the early court date?

THE WITNESS: Yeah.

THE COURT: Okay.

THE WITNESS: As far as -- yeah.

THE COURT: Go ahead.

THE WITNESS: Okay.

BY MR. ALSTON:

**Q.** Okay. And do you remember anything about the specifics of that conversation, what you told the attorneys or what impressions you left the conversation with?

**A.** Well, I'm thinking we were -- we were discussing his case and we were discussing coming to Chicago to testify for him on his behalf, and basically that was it, and telling what we knew

about what happened. I mean, you know --
**Q.** Okay.
**A.** -- about as far as him being in Wisconsin in March, so --
**Q.** Okay. And you said at some point your conversations then proceeded with an investigator --
**A.** Uh-huh.
**Q.** -- as opposed to --
**A.** We was told that a -- that we was asked if we would need a ride to come to Chicago to testify, and we were like, yeah, so we was told that a private investigator will be getting in touch with us and he will be coming to Wisconsin to bring us back to Chicago to testify.
**Q.** Okay. And that investigator, could you describe him, anything you might recall about him?
**A.** He was a tall, black male, I want to say about 6 feet. He was very tall. And he was a pretty nice guy.
**Q.** Okay. And regarding your initial conversations that you mentioned taking place with Leonard's attorneys, do you recall talking to them about Leonard being in Milwaukee?
**A.** Yes. They wanted to know if he had been in Wisconsin the month of March and around the 17th, I do believe.
**Q.** Okay. Are you -- are there any other details that you recall from this conversation?
**A.** Well, it was so long ago, I just -- I can't pinpoint word for word, but I did speak with different people regarding his

case.

**Q.** Okay. And going back to March of 1997, when Leonard was in Milwaukee, what hours did you work?

**A.** I worked from 4:00 to 11:00 and sometimes 12:00.

**Q.** Okay. And, finally, regarding the room in which you waited --

**A.** Uh-huh.

**Q.** -- at Leonard's trial, could you -- you said it was small. You went through some cubicles on the way to get there. Did the room have windows?

**A.** I don't think the room had windows. It had a lot of air. It was pretty -- it was pretty chilly in there.

**Q.** Okay. And one clarifying question regarding your work hours.

**A.** Uh-huh.

**Q.** You said 4:00 to 11:00?

**A.** Uh-huh. Sometime -- I worked in a factory, so some days we would -- you know, if we get the work done, we could leave at 11:00. Sometimes we would have to be there till 1:00, 2:00 o'clock in the morning, you know.

**Q.** Okay. So that was 4:00 p.m. to --

**A.** Uh-huh, 4:00 p.m. --

**Q.** -- 11:00 p.m. --

**A.** -- to 11:00 p.m.

**Q.** -- typically?

**A.** Those were just my initial work hours, but always worked longer.

MR. ALSTON: Okay. No further questions, Your Honor.

THE COURT: Cross.

CROSS-EXAMINATION

BY MR. CHIMERA:

**Q.** Good afternoon, ma'am.

**A.** Hello.

**Q.** Ma'am, before you came to court today, were you able to review anything before you testified?

**A.** No.

**Q.** No transcripts or anything like that?

**A.** I reviewed the transcripts -- I've been had them for a while.

**Q.** I'm sorry?

**A.** When I -- the after -- I mean, the transcript that I -- yeah, I've been had those for a while.

**Q.** You've had them for a while?

**A.** Uh-huh.

**Q.** So did you have a chance to look at them before you came here today?

**A.** No. Just the letter that I wrote that I've had for a while, uh-huh.

**Q.** You got to review a letter you wrote, right?

**A.** Uh-huh.

**Q.** That was like in 2001, I think?

THE COURT: You have to say "Yes" or "No."

THE WITNESS: Yes. I'm sorry. Yes.

MR. CHIMERA: I apologize, Judge.

BY MR. CHIMERA:

**Q.** Now, did you review any other documents?

**A.** No.

**Q.** Okay. Let's talk a little bit about the birthday celebration. Okay? Now, when was your mom's birthday?

**A.** March the 15th.

**Q.** And when would you typically celebrate your mom's birthday?

**A.** Well, we would typically celebrate it on the 15th if it fell like on a day where we were at, like I told you, the bar, the -- they had different days that they will have drink and food specials, so we kind of mapped it out to those days.

**Q.** In March of 1997, did you celebrate --

**A.** Uh-huh.

**Q.** -- your mom's birthday on the 15th?

**A.** No.

**Q.** When did you celebrate it?

**A.** It was a couple -- it had to be -- maybe about two days after.

**Q.** Okay. Not more than two days?

**A.** No more than two days. It was all within the same week.

**Q.** Okay. Now, you know who Earlene Logan is, right?

**A.** Yes, I do.
**Q.** Now, do you know whether or not you saw Earlene at this birthday party in March of '97?
**A.** I don't know if Earlene was old enough to get into the bar at that time. So I'm sure I saw her that day, but -- I mean, you know, the day of, but I don't think that Earlene was old enough to get into the bar at the time.
**Q.** Okay. Fair enough. Do you know -- now, you said that Leonard Logan was at the party, right?
**A.** Uh-huh.
THE COURT: You have to say "Yes" or "No."
BY MR. CHIMERA:
**Q.** And --
THE WITNESS: Yes. I mean -- I'm sorry -- yes.
BY MR. CHIMERA:
**Q.** And Chevelle was at the party?
**A.** Yes.
**Q.** Who else was at the party?
**A.** Chevelle and my brother, my sister, a couple of my girlfriends.
**Q.** When you say your brother, who was that, ma'am?
**A.** Derrick, Derrick. His name is Derrick Neita.
**Q.** Derrick -- would that be Derrick Thomas?
**A.** No, Derrick Neita. He has --
**Q.** I'm sorry?

**A.** -- a different last name. My name is -- my last name is Thomas. His last name --

THE COURT: How do you spell his last name?

THE WITNESS: N-e-i-t-a.

THE COURT: You said that's your brother?

THE WITNESS: That's my brother, uh-huh.

BY MR. CHIMERA:

**Q.** Okay. So -- and who else besides your brother was there?

**A.** My sister, a couple of my friends. Yeah, that's about it. Just kind of small.

**Q.** I'm sorry. When you say your sister, you mean --

**A.** Chevelle.

**Q.** -- Chevelle?

**A.** My sister, Isora Neita.

**Q.** Now, do you remember how Leonard Logan got to Milwaukee for the party?

**A.** Nah, uh-uh. No, I can't -- uh-uh. I can't remember how he got there.

**Q.** Where did Leonard Logan stay when he was in Wisconsin?

**A.** With us most of the time, all the time.

**Q.** All right. And as best as you can remember -- well, you know when March 15th, '97 is because that's your mom's birthday, right?

**A.** Uh-huh.

**Q.** Okay. Insofar as the date of her birthday --

**A.** Uh-huh.
**Q.** -- when would you say that Leonard Logan got to your house?
**A.** I want to say he -- I would almost say the 15th or maybe the -- I really can't say.
**Q.** So you --
**A.** See, because back -- I mean, back then, we were hanging out. You know, I was working. It was a lot going on. I got a lot of nieces and nephews, you know, so it was -- I just can't pinpoint when each one was here, there, you know. I just -- I can't do it.
**Q.** Well, so there were more people staying at your home?
**A.** No, just me and Chevelle and her son.
**Q.** You, Chevelle, and Chevelle's son?
**A.** And Chevelle's son.
**Q.** And at some point, Leonard?
**A.** Leonard was there a lot.
**Q.** Okay.
**A.** Uh-huh.
**Q.** And I understand that. And you've said that, before that he was there a lot.
**A.** Uh-huh.
**Q.** Came to visit you guys.
**A.** Uh-huh.
**Q.** But I'd like to focus on March 15th and try --
**A.** Okay.

**Q.** -- if we can remember, when he actually came to Milwaukee.
**A.** Okay. So I want to say -- I'll say he was there March -- he came March 15th.
**Q.** Okay. And to the best of your recollection, you probably celebrated the birthday within two days of that date --
**A.** Uh-huh.
**Q.** -- but it would be after March 15th?
**A.** Uh-huh. Because I'm --
THE COURT: You have to say "Yes" or --
THE WITNESS: I'm sorry. Yes.
BY THE WITNESS:
**A.** I'm thinking had it been directly on my mom birthday, that would have been something that we would all just remembered. So it was a couple of days after, 'cause I don't think we could have -- we did it on her birthday. It wasn't on her birthday. That I do know.
BY MR. CHIMERA:
**Q.** Okay. Now, you remember when Leonard Logan was wanted for this particular crime, in '97, right?
**A.** Uh-huh.
**Q.** And --
THE COURT REPORTER: I'm sorry?
THE COURT: "Yes"?
THE WITNESS: I mean, yes. I'm sorry.
BY MR. CHIMERA:

Q. Yes. Try to say "Yes," ma'am.
A. I understand. Yeah. I'm sorry.
Q. That's okay.
Now, when was the first time you learned that the police were looking for Leonard Logan?
A. After we had moved from the residence where we was at -- because we lived on 54th and Center, then we moved on East Center. So once we got moved to East Center is when I know that -- I knew that they, you know, were looking for him, because they came to -- the U.S. Marshals came to my home.
Q. Okay.
A. Uh-huh.
Q. And when they came looking for him, did you know where he was at the time?
A. No.
Q. Did they ask you any questions about the date of the crime?
A. Nope. They just -- they came to my home, they asked had I seen Leonard Logan. I told them that he was there previous, you know, but he hadn't been there in weeks. And then they just did a spread with a bunch of other different pictures, asked me had I seen any one of those guys.
Q. When you talked to them, did you know that the murder occurred on March 18th at 11:00, 11:30 at night?
A. No.
Q. So it didn't get that specific, the conversation?

**A.** Uh-uh. Because prior -- it was --

THE COURT: That was "No"?

THE WITNESS: That was "No." Yeah. I'm sorry.

THE COURT: Now you understand --

THE WITNESS: Okay. All right.

THE COURT: -- why it's important --

THE WITNESS: No. Okay.

THE COURT: -- to distinguish, because they both kind of sound the same.

THE WITNESS: Uh-huh.

THE COURT: So it's important to say either "Yes" or "No."

THE WITNESS: Okay.

THE COURT: Okay.

BY THE WITNESS:

**A.** Prior to that, it was an altercation with him and the Chicago Police Department or whatever, so I just thought maybe, you know, that all had something to do with them looking for him. I really didn't know.

BY MR. CHIMERA:

**Q.** Okay. Now, in relation to when they started looking for him --

**A.** Uh-huh.

**Q.** -- when was the next time you talked to Leonard Logan?

**A.** I don't think I had a --

THE COURT: So, in other words --

BY THE WITNESS:

**A.** I don't --

THE COURT: -- when the marshals came, how long was it after that?

MR. CHIMERA: Yes, Judge.

THE COURT: That's your question?

BY THE WITNESS:

**A.** Oh, I didn't get a chance to talk to Leonard for a long time.

BY MR. CHIMERA:

**Q.** Okay. But you did talk to him?

**A.** No. I -- over -- after that, yeah. Way, way after that. But --

**Q.** So --

**A.** -- during that time, I didn't get a chance to talk to him at all.

**Q.** Okay. So after the marshals came looking for him --

**A.** Uh-huh.

**Q.** -- in -- sometime in the spring of '97, you did talk to him after that?

**A.** I talked -- yeah, I think I may have talked to him.

**Q.** All right. Did you talk to him while he was in jail?

**A.** Hum. I don't know. I don't -- I can't remember. I don't even --

**Q.** Did he ever -- did he ever call you on the phone?
**A.** Oh, he probably did. I -- that was so long ago, I just -- I can't remember all that. I can't remember a phone call and all that.
**Q.** And maybe I can make it more specific, then. I apologize.
**A.** Uh-huh.
**Q.** Did he ever -- did you ever get a collect call from the jail from Leonard Logan after the police were looking for him or the marshals were looking for him?
**A.** No. My phone didn't accept collect calls, so no, I didn't talk to him.
**Q.** Did you ever visit him at the jail?
**A.** Never visited him.
**Q.** So is it your testimony today that you never spoke to Leonard Logan from the time the marshals came to your home looking for him --
**A.** Uh-huh.
**Q.** After that, you never talked to Leonard Logan?
**A.** I can't say that I didn't or I did. I just -- I don't -- I can't remember back. I don't know if I had conversations with him then. I really don't -- I really can't tell you. I don't know.
MR. CHIMERA: Your Honor, for the record, I have a copy of a transcript that's in the record. I have another copy for Your Honor if you'd like it.

THE COURT: I've got them all.

MR. CHIMERA: You've got them all, Judge? It's for the September 1st, 2009 --

THE COURT: That's the post-conviction?

MR. CHIMERA: -- post-conviction proceedings, Judge.

THE COURT: Do you have the page numbers?

MR. CHIMERA: I'm going to get to the pages in just a second.

THE COURT: Okay.

MR. CHIMERA: And for the record, I'm approaching the witness. May I --

THE COURT: Yeah, that's fine.

MR. CHIMERA: -- show her a copy, Judge?

BY MR. CHIMERA:

**Q.** Ma'am, let me show you what, for the record, is pages 65 through 110 --

THE COURT: That's a whole different system from the one I have.

MR. CHIMERA: Is it, Judge?

THE COURT: So, does it have the little numbers in the lower right-hand corner?

MR. CHIMERA: This one I have does not --

THE COURT: Does not?

MR. CHIMERA: -- but I have a copy for you, Judge.

THE COURT: No, that's okay. Let me -- well, I'd

prefer to have the one that I'm using here. Why don't I take that for now. Thanks.

(Document tendered to the Court.)

MR. CHIMERA: And, again, for the record, I've handed to Your Honor and to Chevelle a copy of a transcript -- it's labeled Exhibit 16.

THE COURT: Right.

MR. CHIMERA: In front, it says "September 1st, 2009" with a caption "People versus Leonard Logan" in the case number 97 CR 19288. And there are pages 65 through 110.

And I'll ask you a question in just a minute, ma'am.

THE WITNESS: Oh.

BY MR. CHIMERA:

**Q.** Now, ma'am, you remember testifying in September of 2009 at a hearing that related to Leonard Logan's case? Do you remember that?

**A.** Testifying where?

**Q.** In -- that would be in Chicago.

**A.** No, I never testified.

THE COURT: Not at his trial, but later on.

THE WITNESS: No, I never testified. This is my first time in the courtroom, period.

THE COURT: What's your middle name?

THE WITNESS: Yovonda.

THE COURT: Okay. You never remember going to a

courtroom down at the other part of town, another part of town --

THE WITNESS: Uh-huh.

THE COURT: -- and being asked questions about --

THE WITNESS: No.

THE COURT: -- this?

THE WITNESS: No.

THE COURT: Okay. Well, first time for everything.

THE WITNESS: Yeah. My middle name is Yovonda, Y-o-v-o-n-d-a.

MR. CHIMERA: Okay.

THE COURT: Can I see counsel and the court reporter at sidebar, please.

MR. CHIMERA: Sure.

THE WITNESS: Uh-uh.

(Proceedings heard at sidebar on the record:)

THE COURT: Is this the same person you questioned at the post-conviction hearing?

MS. THOMPSON: It is. I think -- this is not my expect -- her expected testimony from us, Your Honor. I think it might be --

THE COURT: Well, I would imagine not.

MS. THOMPSON: It might further your question if she remembers being questioned by me previously. I mean, I don't know what she's going to say, but I -- there may be some

confusion here. I'm not sure why.

THE COURT: Okay. So we'll see if you beat the finger or not. I'm going to ask you to stand up and --

MS. THOMPSON: Fair enough.

THE COURT: Okay. This is good.

(End of proceedings at sidebar.)

THE COURT: So, Ms. Thomas, let me ask you a question or two. Ms. Thomas, do you see the young lady with the glasses and short hair there?

THE WITNESS: Uh-huh.

THE COURT: Do you --

THE WITNESS: Tara? Yes.

THE COURT: Did you ever meet -- remember being questioned by her before?

THE WITNESS: Yeah, Tara.

THE COURT: Where were you when you were questioned by her?

THE WITNESS: I think I was in Wisconsin. Oh, I came here. I came here for her, but I never -- I never testified. Well, she asked me -- she -- yeah, she asked me a lot of questions.

THE COURT: Where was she asking -- how long ago are we talking about?

THE WITNESS: I want to say -- ooh, you got me with these years. This was recently. The last --

THE COURT: Okay.

THE WITNESS: -- trial he had is when I was familiar with Tara. So yeah, uh-huh.

THE COURT: Okay. So whenever it was that you were questioned by Ms. Thompson --

THE WITNESS: Uh-huh.

THE COURT: -- were you in an office or were you in a chair like you're in now? Maybe not quite as nice a chair.

THE WITNESS: I did a lot of talking with Tara.

THE COURT: Just --

THE WITNESS: Oh, my God, I can't -- I know I came here, and I --

THE COURT: "Here" being Chicago?

THE WITNESS: Here in -- yeah, here in Chicago.

THE COURT: Okay.

THE WITNESS: And -- yeah, I talked to Tara a lot, but --

THE COURT: But you don't remember sitting on a witness stand ever?

THE WITNESS: I don't. I don't remember sitting on a witness stand, no.

THE COURT: Okay. And you don't remember being in a place where there would have been a judge sitting either --

THE WITNESS: Uh-uh.

THE COURT: -- to the left or the right of you?

THE WITNESS: No. I never got a -- I never was here.

THE COURT: So Judge Obbish beats the finger, too, apparently, so -- all right. Well, just go ahead and we'll --

MR. CHIMERA: Let me see what I can do, Judge.

THE COURT: Yeah.

MR. CHIMERA: Okay. Thanks.

BY MR. CHIMERA:

**Q.** Okay, ma'am. I've showed you a transcript --

**A.** Uh-huh.

**Q.** -- that at least appears to be yours.

**A.** Uh-huh.

**Q.** And I understand you don't remember.

**A.** Uh-huh.

**Q.** It's dated September 1st. Could you take a look at page 78, please. I'm going to ask you if anything there is going to refresh your memory, ma'am. That's all.

**A.** 78?

**Q.** Go to page 78. And if you would go to -- beginning with line 5. And I'll read it along with you, if that's okay, Your Honor.

THE COURT: Go ahead. That's fine.

BY MR. CHIMERA:

**Q.** The question is: "Did you talk to Mr. Logan about being an alibi witness for him before his trial?

"Answer: (Nods head yes)."

Do you remember ever being asked that question by anybody and giving that answer? Does that refresh your memory at all, ma'am?

**A.** Yeah. Well, yes. Yeah.

**Q.** Okay.

**A.** Yes.

**Q.** Would that be accurate, then, that you did talk to him before his trial about his alibi defense?

**A.** No. I got to be honest with you guys, I just -- it was so long ago, all these dates, I -- I don't -- no, I can't say.

**Q.** Okay. So --

**A.** I can't say. I don't want to say that I did or I didn't. I just can't say because -- it was so long ago, I've forgotten a lot of things, so I just can't be just yeah --

**Q.** Okay.

**A.** -- you know.

**Q.** Fair enough. It doesn't refresh your memory, right?

THE COURT: Looking at this doesn't refresh your memory at all?

THE WITNESS: No.

THE COURT: Okay.

BY MR. CHIMERA:

**Q.** No. Okay. And you basically don't remember?

**A.** I can remember some things, but as far as being in a courtroom and testifying and stuff like that, I wasn't.

Q. Okay. There's another question there on line 8:
"You need to answer out loud."
Then there's the answer: "I'm sorry. Yes."
And then there's another question on line 10:
"Mr. Logan asked you to come to court to testify on his behalf?"
Your answer is: "He did."
Now, do those questions and answers help refresh your memory as to whether or not you had discussions with Leonard Logan after the marshals came but before there was an actual trial for Leonard Logan?
A. Well, I'm sure -- I'm sure I -- I had to. I must have been asked to come testify for him.
Q. Okay. But I -- but my question is -- we're trying to focus on whether or not you --
THE COURT: But we have to establish --
BY MR. CHIMERA:
Q. -- may have talked to him.
THE COURT: -- with your niece's --
BY THE WITNESS:
A. It wasn't --
THE COURT: -- son about that.
BY THE WITNESS:
A. It wasn't too much discussion going on with Leonard Logan, period, with me, you know.

THE COURT: So when you say "not too much," "not too much" doesn't mean nothing, so --

THE WITNESS: No. As far --

THE COURT: -- it's just not -- stop.

THE WITNESS: Yeah. Okay. I'm sorry.

THE COURT: You don't even know what my question is yet, so stop, stop.

So what Mr. Chimera is trying to get at is whether you ever talked to Mr. Logan over the phone, in person, by smoke signal, or anything else about possibly being an alibi witness for him.

THE WITNESS: Yeah, I spoke to him.

THE COURT: Okay.

THE WITNESS: Uh-huh.

THE COURT: And do you remember whether it was on the phone or in person?

THE WITNESS: It may have been on the phone. I never saw -- I haven't saw him since --

THE COURT: But you don't remember --

THE WITNESS: -- he got locked up.

THE COURT: You don't remember ever going --

THE WITNESS: Uh-uh.

THE COURT: -- to jail to talk to him?

THE WITNESS: Never, never.

THE COURT: Okay. All right.

THE WITNESS: That I never did.
THE COURT: All right.
MR. CHIMERA: Okay, Judge. Thank you, Judge.
BY MR. CHIMERA:
**Q.** Let me ask you this. Since you recall talking to him, do you remember what you talked about?
**A.** Testifying, coming to testify for him in court, and that it was very important.
**Q.** Okay. Did he tell you what he wanted you to testify to?
**A.** He didn't tell me anything. The most I found out about his trial was through him being retrialed and finding everything out. 'Cause other than that, I was clueless.
THE COURT: I'm going to interject a question, because now I'm getting something.
When you talk about it being retried, what are you referring to?
THE WITNESS: Well, when he went to trial the first time and --
THE COURT: Right.
THE WITNESS: -- went to jail, you know, and then he came back for the second time. When he came back for the second time is when I started to kind of like understand the whole case.
THE COURT: Okay.
THE WITNESS: Because before then, it was just -- you

know, he was in jail. He needed us to come testify that he was in Wisconsin at the time, so --

THE COURT: So you're talking about when he came back for the second time?

THE WITNESS: For the second time.

THE COURT: That was after the trial?

THE WITNESS: That was after the trial. The first trial, I didn't really understand --

THE COURT: No, hold on a second. You know I'm going to ask.

THE WITNESS: Okay.

THE COURT: So the trial when you came down from Milwaukee --

THE WITNESS: Uh-huh.

THE COURT: -- that you talked about where you sat in the room after going through the room with the cubicles --

THE WITNESS: Uh-huh.

THE COURT: -- was that the first trial or the second trial?

THE WITNESS: That was the first trial.

THE COURT: First trial? Okay.

THE WITNESS: Uh-huh.

THE COURT: And then -- and so the second time --

THE WITNESS: Uh-huh.

THE COURT: The second trial, did you come back down

to Chicago then?

THE WITNESS: I came back down to Chicago.

THE COURT: Where did you go?

THE WITNESS: I was --

THE COURT: Was it the same building that you had gone to the first time?

THE WITNESS: I think it was the same building, if that's 26th and California.

THE COURT: It is, yes.

THE WITNESS: I went to that building. I was in the court building. I was closer the second time than I was the first time to the court building, so --

THE COURT: But you don't remember ever actually going into a courtroom? It wouldn't have had --

THE WITNESS: I think it was --

THE COURT: -- all this wood around it. There'd have been just --

THE WITNESS: Uh-uh. I think it was a glass -- it was a small courtroom and the glass, so they were -- they were like in the courtroom in front of the glass and we were like out. You know, we could see what was going on, but --

THE COURT: Okay.

THE WITNESS: -- we wasn't in the actual, you know, courtroom. But I was right there seeing what was going on. I just wasn't in the second half of it.

THE COURT: But you don't remember ever being on the other side of the glass, though?

THE WITNESS: No.

THE COURT: You were always sitting just in the gallery is all you remember?

THE WITNESS: Uh-huh.

THE COURT: Okay.

THE WITNESS: On the other side.

THE COURT: Does anybody know -- well, maybe one person would have been there -- whether Judge Obbish is in a smaller courtroom or a bigger courtroom at that point?

MR. CHIMERA: I know now. I think he's in a big one.

THE COURT: He's in a bigger one now, I'm pretty sure of that, but --

MS. THOMPSON: I can answer that question, Your Honor, but I'm not going to --

THE COURT: No, we'll talk about it later. Okay. All right.

BY MR. CHIMERA:

**Q.** Okay. So you do remember talking to Leonard after the marshals came but before his first trial?

And by "first trial," I mean the first time you had to come to Chicago about possibly testifying for him.

**A.** Right.

**Q.** Okay.

A. That was my reason for coming to Chicago, to testify --
Q. All right.
A. -- for him.
Q. Okay. Thank you. Now, between the time the marshals came to talk to you in Wisconsin in March of '97 -- or in the spring of '97 and the time the trial started --
A. Uh-huh.
Q. -- you talked to Leonard's attorneys, right?
A. Yeah.
Q. And that's the phone conversation you were talking about, right?
A. Right, the phone conversation regarding his case and bringing us here to Chicago.
Q. Okay. And I just want to ask you a few questions about the telephone conversation.
A. Okay.
Q. Okay? Now, did the person who called you identify himself on the phone?
A. Uh-huh.
THE COURT: That's a "Yes"?
THE WITNESS: I mean, yes. I'm sorry. Yes.
BY MR. CHIMERA:
Q. Did he say whether his name was Martin Kelly?
A. You know what? No, I don't -- I can't -- I can't remember.
Q. It could be? It may or may not be is basically -- is that

fair enough?
**A.** I can't remember. I -- I thought it was a woman.
**Q.** Okay. But it --
**A.** I thought -- I thought -- I thought that his first attorney was a woman. That's what I -- I thought. I'm not for sure.
**Q.** Okay. But somebody called you and they talked to you about Leonard's case, right?
**A.** Right.
**Q.** And you think it's a woman, but it was a -- did the person --
**A.** It was like a --
**Q.** -- identify themselves?
**A.** It was a couple of people working on this case, because we was talking with someone that was supposed to have been his attorney and the private investigator. These were the two people that we were talking to. An attorney was the one that told us that a private investigator will be coming up to get us, bringing us to trial to testify for him.
**Q.** Okay.
**A.** Those were the couple of people, you know, that I talked to.
**Q.** All right. Now, what I want to focus now on is what was specifically said, and let me just ask the question and see if I can make it clear enough. Okay?
What did you specifically tell this person on the

phone about where Leonard was in March and April of '97? What did you tell him?

**A.** Told him that he was in Wisconsin.

**Q.** Okay. Did you give him a specific date as to the date he was in Wisconsin in March of 1997?

**A.** I told him it was around my mother's birthday.

**Q.** Okay. Did you tell him what your mom's birth date was?

**A.** I may have, yeah. I may -- I may have. May have, may -- I have --

**Q.** So you may have said it was March 15th, '97. He was there around that date?

**A.** I knew he was in Wisconsin around that time. That I knew for sure.

**Q.** Okay. Did you get any more specific than that?

**A.** I don't think so. I can't recall. I just can't recall the conversations that I had with these people 18 years ago. I just -- I've been racking my brains. I just can't do it.

**Q.** And I wanted to ask you just a few questions about specifics, and I got a feeling you're going to tell me you don't remember, but I need to ask you anyway. Okay?

**A.** Go ahead.

**Q.** Okay. Did you tell the person -- and we're talking about this telephone conversation you had with the attorneys. Did you tell him that, you know, that this birthday celebration, you celebrated it every year and that's why you remember it?

**A.** Sounds about right.
**Q.** Okay. Did you tell -- and you didn't give him a specific date for the birthday party, right?
**A.** I don't know. Back then, I may have given a specific date because I probably knew exactly what happened and what went on back then.
**Q.** But as you sit here now, do you know the specific date that you would have told the attorney?
**A.** No. I don't know that.
**Q.** All right. Now, did you tell him that Earlene Logan had driven Leonard Logan down to Milwaukee for the party?
**A.** I may have told them that depending on if that's what happened at that time.
**Q.** But my --
**A.** Like I said --
**Q.** I guess my --
**A.** -- back then, you know, with the nieces and nephews, they coming and going. I just wasn't keeping track of who just -- you know, I -- nah.
**Q.** So you don't remember if you said that?
**A.** (Nodding.)
**Q.** Okay. Do you remember if you mentioned that Derrick -- was it -- did you say it was Neita or Meita?
**A.** Neita.
**Q.** N-e-i-t-a?

A. T-a.
Q. Did you tell him that he was at the party?
A. I don't know. I don't -- I don't know.
Q. Okay. Would it be fair to say if I asked you any more questions about the details of your conversation --
A. Uh-huh.
Q. -- with the attorney that called you up about Leonard Logan's case before his trial, you would basically say, "I don't remember any of the details"? Would that be fair to say?
A. I can remember some details. I can't remember word for word conversation, can't remember time for time and dates, but -- yeah.
Q. All right. Then just give us one answer. What do you remember?
A. What do I remember as far as what?
Q. The conversation. What'd you tell him?
THE COURT: With the lawyer.
BY THE WITNESS:
A. With the lawyer?
BY MR. CHIMERA:
Q. With the lawyer, the conversation with the lawyer from --
A. I can't remember word for word conversation with the lawyer.
THE COURT: Do you remember what generally you discussed? Generally without word for word?

THE WITNESS: We generally discussed if Leonard Logan was in Wisconsin around those dates.

MR. CHIMERA: Okay.

THE WITNESS: That's what we discussed. That's the main thing that I can remember. Everything else, the little conversations in between, I can't remember that.

MR. CHIMERA: Fair enough. Thank you.

May I have just one moment, Judge?

(Counsel conferring.)

BY MR. CHIMERA:

**Q.** Ma'am, just so I understand it clearly, Ms. Thomas, you were subpoenaed to appear in his trial, right, Leonard Logan's trial?

**A.** Which trial is -- we talking about?

**Q.** The first time you came to Chicago.

**A.** Was I subpoenaed? I don't think I was subpoenaed. I don't --

**Q.** But they drove you down?

**A.** They drove me down.

**Q.** Okay.

**A.** I don't know if I was subpoenaed or not.

**Q.** And you remember being in a room next to some cubicles, right?

**A.** Uh-huh.

THE COURT: You have to answer --

BY THE WITNESS:

**A.** Yes.

THE COURT: -- "Yes." Okay.

BY MR. CHIMERA:

**Q.** Do you remember ever having any conversations with any of the attorneys once you arrived here in Chicago during the trial? When I say "trial," I mean that first time you came down here.

**A.** No.

**Q.** You -- but you remember talking to the investigator?

**A.** I remember talking to the investigator. I remember talking to the attorney that was working on the trial, because they were the ones that put it together for us to come up here to testify.

**Q.** Now, when you would come to court each day -- and when I say each day of court, talking about that first trial that you have in your mind.

**A.** I only came one day.

**Q.** You only came one day?

**A.** I was only asked to come one day.

**Q.** All right. How did you get down to the courtroom -- or to the courthouse?

**A.** They came to Wisconsin and picked me up and brought me to Chicago.

**Q.** Oh, so you were there just one day?

**A.** One day. They came up and got me for the day of the trial.
**Q.** Okay. And then that night you went back to Milwaukee?
**A.** Uh-huh, yes.
**Q.** Did they give you a ride back?
**A.** Yeah, yes. They took -- they took us back.
**Q.** Okay. And for that one day, did you have any interaction with Leonard Logan's mom, Ezzie Logan?
**A.** No, uh-uh, no.
**Q.** Did you talk to Earlene Logan?
**A.** No.
**Q.** So you were -- you never talked to them at all?
**A.** No.
MR. CHIMERA: One moment, Judge.
THE COURT: Sure.
(Counsel conferring.)
MR. CHIMERA: Judge, no further questions.
THE COURT: Mr. Alston?
MR. ALSTON: Just one further question, Your Honor.

REDIRECT EXAMINATION

BY MR. ALSTON:
**Q.** So, Ms. Thomas, when you answered the opposing counsel's questions regarding a letter you'd reviewed this morning, did you mean affidavit or did you look over your -- in addition to the letter you reviewed, did you look over your old affidavit that you had previously signed?

**A.** Yes, I did.

MR. ALSTON: Okay. No further questions, Your Honor.

THE COURT: Anything else based on that?

MR. CHIMERA: No, Judge.

EXAMINATION

BY THE COURT:

**Q.** So I just want to make sure I'm understanding. So you -- the time you came down to Chicago during Mr. Logan's first trial, you came down one day and one day only?

**A.** One day.

**Q.** And you were driven down by the investigator, the African-American man you described?

**A.** Right.

**Q.** And you were driven back by him?

**A.** Right.

**Q.** Okay. And were you the whole day in the room that you talked about?

**A.** The whole day.

**Q.** Did you, like, have lunch or something at some point?

**A.** We didn't even -- we didn't have any lunch. They didn't want us to leave out the room.

**Q.** Okay.

**A.** When he came to get us, the trial was over and he was bringing us up to meet with the family.

**Q.** Got it. "The family" being Leonard's family?

**A.** Earlene -- yeah, they were up there. And he was like if you want to meet with them and you want to talk with them, that's where we're going. So they --

**Q.** And did you go there?

**A.** We went up to where the court was going on, but it was over.

**Q.** Was the -- was Mr. Logan's family still around?

**A.** Yeah, I think they were -- yeah, they were, yeah.

**Q.** So you may have had some interaction with them at that point?

**A.** Well, after the court, just 'cause he was like, "Well, do you want to meet with the family and talk?" Went up there.

**Q.** So when you say "after court," what did you -- when you went up there to the courtroom, what did you understand had happened by then? Was the case over or --

**A.** Well, things wasn't -- things didn't look good.

**Q.** Okay.

**A.** So --

**Q.** But I'm trying to get a handle on where -- what part of the process it was at. Was there -- I mean, did you ever go in the courtroom?

**A.** You know what? After the court, it wasn't very much conversation. It was a lot of -- it was a lot of -- it was a lot going on, you know.

**Q.** Okay. I understand.

**A.** Right.
**Q.** I just want to take this one step at a time.
**A.** Uh-huh.
**Q.** So the guy comes to get you?
**A.** Right.
**Q.** He says you're not needed to testify?
**A.** "You don't" -- "You guys were not needed to testify."
**Q.** He took you up to -- by the courtroom. Did you ever actually walk through the door of the courtroom?
**A.** No.
**Q.** So you were outside the whole time?
**A.** Outside in the hallway the whole time.
**Q.** Okay. And did anybody come out to talk to you while you were out there?
**A.** Not that I can remember.
**Q.** Were there other people out there when you got there?
**A.** It was other people out there.
**Q.** Family members?
**A.** Family members. I think maybe the guy family or whoever. 'Cause I -- I think it was -- I don't know. It was a lot going --
**Q.** Okay.
**A.** Yeah, it was a lot --
**Q.** So do you know whether the trial was still going on at that point or had you been --

**A.** No. The trial was completely over, because we were going home.
**Q.** Okay. Did you know whether the jury had come back with a decision or verdict yet?
**A.** Yeah, they had come back.
**Q.** Okay. So that was -- you understood --
**A.** But it was done.
**Q.** -- it was done done?
**A.** It was done done.
**Q.** Okay. So whatever -- so if you had any discussion with family members, it was after the trial was all over?
**A.** After. It was done.
**Q.** Were there any lawyers still up there when you went up there?
**A.** If they were, they were still in the courtroom.
**Q.** They didn't come and talk to you?
**A.** Or they were all coming out. Every -- you know, everybody was coming out.
**Q.** So did anybody who was connected with the case other than family members talk to you at all?
**A.** No.
**Q.** Okay. How long were you up there in that area before you left?
**A.** I want to say all of maybe 15 minutes. And that was only to catch the family, you know, catch --

**Q.** Yeah. Right.
**A.** -- the family and talk with them --
**Q.** And then the guy --
**A.** -- for a minute.
**Q.** The guy who was driving you back and forth, was he -- did he kind of stay around there?
**A.** He kind of spaced away and told us -- you know, we had a time set for when we were going to go back to Wisconsin.
**Q.** Okay.
**A.** So he just let us go up there to talk to them for a few minutes before we headed back to Wisconsin.
**Q.** Okay. And then so you -- so then you went with him to a car and then you drove back home?
**A.** Went -- right.
**Q.** Okay. And so who drove back home? Was it just the investigator and you and your sister or were there other people that went?
**A.** The investigator and my sister and I. Yeah, I think it was just us two and the investigator.

THE COURT: Okay. All right. Follow-up questions based on my questions? Mr. Alston, no? Mr. Chimera, no?

Thanks, ma'am. You are excused.

Next witness, please.

THE WITNESS: Do you want this? He wants this?

THE COURT: Yeah, just leave it up there. I'll take

care of it.

(Witness excused.)

THE COURT: Mr. Chimera or Mr. Goodfriend, here's your --

(Documents tendered back to counsel.)

MS. THOMPSON: We're calling Chevelle Thomas, Your Honor. That's C-h-e-v-e-l-l-e.

(Witness enters courtroom.)

THE COURT: Right up here, ma'am. Please come right around here.

THE WITNESS: Right there?

THE COURT: Yeah. Raise your right hand first.

(Witness duly sworn.)

THE COURT: Have a seat. Go ahead and sit down. I'm going to adjust the microphone so it is right in front of you.

THE WITNESS: Okay.

THE COURT: It is right in front of you. Good. All right. Go ahead.

CHEVELLE E. THOMAS, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. THOMPSON:

**Q.** Good afternoon, Ms. Thomas.
**A.** Good afternoon.
**Q.** Can you hear me okay?
**A.** Yes, I can.

C E R T I F I C A T E

I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Continued Evidentiary Hearing proceedings, Pages 218 to 458, had in the above-entitled case before the HONORABLE MATTHEW F. KENNELLY, one of the Judges of said Court, at Chicago, Illinois, on February 19, 2014.

*/s/ Colleen M. Conway, CSR,RMR,CRR* — *03/03/14*

Official Court Reporter — Date
United States District Court
Northern District of Illinois
Eastern Division